UNITED STATES of America, Plaintiff,

v.

Carlos FLOREZ, Defendant.

No. CR 94–0222 MV.

United States District Court,
D. New Mexico.

Oct. 17, 1994.

David Williams, Albuquerque, NM, for plaintiff.

Gary Nelson, Nancy Hollander, Albuquerque, NM, for defendant.

## *MEMORANDUM OPINION AND ORDER*

VAZQUEZ, District Judge.

THIS MATTER is before the Court on Defendant's Motion to Suppress Physical Evidence, filed May 4, 1994, and Motion to Suppress Statements, filed May 19, 1994. The Court has reviewed the briefs submitted by counsel, and heard oral arguments on July 1, 1994.

At the motions hearing, the United States represented to the Court that the statements which were the subject of the Defendant's Motion to Suppress Statements, would not be used by the government at trial; therefore, that Motion was not argued and is deemed moot.

## FACTS

On March 2, 1994, narcotics agents boarded an eastbound Amtrac train, at the Albuquerque train station, en route from California to New York.

Agent Samuel Michael Candelaria, an Albuquerque Police Officer assigned to the Drug Enforcement Administration Task Force, was patrolling the train station and boarded the two-level 413 coach car and saw two large, hard-sided Goldenman suitcases, one black and one maroon, on the lower level of the car, in the common luggage area.[1] He apparently became suspicious of the two suitcases and made a request to have a certified narcotics canine examine all the luggage stored in the common luggage area of the 413 coach car.[2]

Officer Robert Lujan, a detective with the Albuquerque Police Department's Drug Interdiction Unit, and his canine named "Bobo," a Belgium Malanoid, were called to the 413 coach car by Agent Jeanette Tate, and Bobo alerted—first to the maroon suitcase and then to the black suitcase, indicating the odor of a controlled substance. A piece of tape with a name and address printed on it was attached to each suitcase. Agents Candelaria and Tate claim they were unable to make out the name printed on the tape. They then allegedly made at least three announcements over the train's intercom system, describing the suitcases and asking the owner(s) to come forward to the luggage area.[3] When no one responded, the luggage was seized from the train, taken to the Albuquerque District Drug Enforcement Agency (DEA) office, and opened.

Approximately 32.6 kilograms of cocaine were found stored in the two suitcases. Interestingly, once the luggage was searched

---

1. Agent Candelaria testified that all coach cars have two levels. The bottom level consists of a common luggage area, rest rooms, and handicapped seating. The upper level consists of open passenger seating.

2. Agent Candelaria testified that the suitcases were large, appeared to be matching brands, and appeared to be brand new. The Court assumes, without commenting, that these facts formed the basis of his suspicion.

3. Agent Candelaria testified that he does not know if the announcement was transmitted throughout the entire train or if it could only be heard in coach car 413.

and the drugs were discovered, the agents were able to read the name "C. Florez" printed on the tape attached to the suitcases. An investigation was initiated to find "C. Florez." The agents discovered that a "Carlos Florez" had purchased a train ticket in Los Angeles on March 1, 1994, traveling through Albuquerque to New York Penn Station. The agents attempted to intercept "C. Florez" at a train stop in Las Vegas, New Mexico, after receiving a description of him and his travel companion from the travel agency which sold him the tickets. However, "C. Florez" was not located at that stop. It was not until the train reached a stop in La Junta, Colorado, and Defendant inquired with train officials about his missing luggage, that he was arrested.

Defendant asserts that the officers violated his Fourth Amendment rights in either of two ways: (1) they lacked probable cause to make a warrantless search of his luggage; or (2) they searched his suitcases in the absence of a warrant or any exception to the warrant requirement.

The government argues that the Defendant does not have standing to challenge the search because he abandoned his suitcases. Furthermore, even if the suitcases were not abandoned, a search warrant was unnecessary because the agents had probable cause and the following exceptions to the warrant requirement applied: (1) exigent circumstances; (2) an inventory search; and (3) the plain view doctrine.

## ANALYSIS

The Fourth Amendment protects individuals and their property from unreasonable searches and seizures by the government. *United States v. Ibarra*, 955 F.2d 1405, 1408 (10th Cir.1992) (*citing United States v. Place*, 462 U.S. 696, 700, 103 S.Ct. 2637, 2641, 77 L.Ed.2d 110 (1983)). When a search and seizure is challenged as violative of the Fourth Amendment, the government bears the burden to prove its validity. *Id.*

Defendant Florez argues that the government lacked probable cause to search his luggage. The government argues that Defendant Florez forfeited his right to challenge the search of his suitcases because he abandoned them.

## ABANDONMENT

When individuals voluntarily abandon property, they forfeit any expectation of privacy in it that they might have had. *United States v. Jones*, 707 F.2d 1169, 1171 (10th Cir.) *cert. denied*, 464 U.S. 859, 104 S.Ct. 184, 78 L.Ed.2d 163 (1983). The test for abandonment is whether an individual has retained any reasonable expectation of privacy in the object. *Id.* at 1172. This determination is made by objective standards. *Id.* An expectation of privacy is a question of intent which may be inferred from words, acts, and other objective facts. *Id.*

In *Jones*, the defendant was found to have abandoned a satchel which police saw him carrying and later found lying on the ground near a building where the defendant was discovered hiding, after he ran from police. The *Jones* court found that the defendant's words and actions manifested his clear intent to relinquish his expectation of privacy and to abandon the satchel. 707 F.2d at 1172. He had denied knowing anything about the satchel when first apprehended by the police and again denied owning it once it was found on the ground. *Id.* Further, the court determined the defendant abandoned any privacy interests he may have had in the satchel by leaving it lying on the ground where he risked losing it forever. *Id.* at 1172–73.

Here, Defendant Florez had identified each piece of luggage with his name and address printed on a piece of tape attached near the handle.[4] Defendant never denied owning the luggage. In fact, when Defendant discovered his luggage missing, he inquired about it at the train station in La Junta, Colorado. Defendant's actions of identifying his luggage and searching for it, once he discovered it was missing, viewed objectively, negate any conclusion that he voluntarily relinquished his expectation of privacy in the luggage and abandoned it.

---

4. The Court examined the luggage at the hearing and, unlike the agents, had no trouble reading the name "C. Florez" printed on the tape attached to both suitcases.

The government, relies on *United States v. Hernandez*, 7 F.3d 944 (10th Cir.1993), where this circuit upheld a decision by District Judge James Parker that a warrantless search of a backpack was proper, after determining it was abandoned. *Hernandez* is distinguishable in several respects.

The defendant in *Hernandez* was traveling on a bus that was sent to a secondary inspection area at the permanent border inspection area near Truth or Consequences. *Id.* at 945. Two border patrol agents entered the bus and noticed a blue backpack stored above an empty seat and inquired about its ownership. When no one seated nearby claimed ownership, the agent asked in a loud voice, if it belonged to anyone, while pointing towards the backpack. *Id.* He also made an effort to scan the entire bus and make eye contact with all the passengers. *Id.* When no one responded, the agent picked up the backpack, held it in the air, and once more asked who owned it and received no reply. The bag was then taken off the bus and subjected to a dog sniff. *Id.* When the dog alerted, the bag was opened and cocaine was found. An agent returned to the bus to make another effort at determining who owned the bag and a passenger finally identified the defendant as its owner. The defendant was taken off the bus where he again denied ownership. *Id.* By repeatedly failing to acknowledge ownership and by distancing himself from the backpack, the court determined the defendant lacked any expectation of privacy in it, and thereby abandoned it. *Id.*

The *Hernandez* court determined that the fact that the defendant chose to sit approximately seven or eight rows away, on the opposite side of the aisle from where he placed his backpack, indicated his desire to distance himself from it. *Id.* at 947. The court pointed out that the bus was not crowded and, therefore, the defendant was not required to place the backpack several rows away from where he was sitting. *Id.* The government misconstrues the reasoning in *Hernandez* and contends that by failing to respond to the announcements, Defendant Florez, like the defendant in *Hernandez*, chose to distance himself from his luggage

and voluntarily abandon it. Moreover, this argument is not supported in the record.

First, the government incorrectly argues that like the defendant in *Hernandez*, Defendant Florez elected to distance himself from the luggage by failing to respond to the announcements. The *Hernandez* court, in finding the defendant elected to distance himself from his backpack, was referring to the fact that he sat on the opposite aisle, several seats away from where he placed his backpack on the bus.

Defendant Florez was traveling on a train where most, if not all, of the passengers' luggage was stored in a common luggage compartment, consisting solely of luggage. In the luggage cars, the luggage was stored away from all passengers, not just from Defendant Florez. By placing his luggage in the common luggage compartment on coach car 413, along with other passengers' luggage, it can hardly be said that Defendant Florez purposefully sought to "distance" himself from his luggage. This was unlike the defendant in *Hernandez*, who was riding a bus with overhead storage located above all passenger seats, and who chose to place his backpack in one spot and sit several rows away from it.

Furthermore, the government did not establish whether Defendant Florez even heard the announcements. The record lacks any information about whether the broadcasts were transmitted throughout the entire train or were limited to one or certain train cars. It is unknown whether the announcements could be heard in the dining car, lounge area, or in the restrooms. Further, Agent Candelaria testified that the announcements were made when *almost* everybody was on board, so it is not even clear whether Defendant Florez had re-boarded the train prior to the broadcasts.

In *Hernandez*, it was clear that the defendant heard the announcement seeking the owner of a backpack because the announcement was made on an uncrowded bus with a "captive audience," so to speak. The bus was stopped for inspection, traveling had ceased, an agent stood in the aisle holding up a bag and asking in a loud voice: "Who owns

this bag?"[5] 7 F.3d at 945. It would have been hard to argue that someone on that bus did not hear him or know what was going on in that confined setting. In addition, the agent made an effort to make eye contact with every passenger on the bus, while awaiting a response regarding ownership. *Id.* In this case, passengers could have been on any number of train cars and it is unknown which cars received the broadcast or whether everyone had re-boarded the train at the time the announcements were made.[6]

Although the agent in *Hernandez* did not individually ask every passenger directly whether the bag was theirs, his announcement could easily be heard by all passengers, and the contact was closer and more direct than what happened here.

Furthermore, here the agents took the luggage off the train without allowing sufficient time for passengers to respond to the announcements. Both Agents Candelaria and Tate testified that three announcements were made over the train's intercom system describing the suitcases and asking the owners to go to the common luggage car. According to the agents, these announcements were made in approximately two minute intervals.

Defendant submitted as Exhibits U through Z, and AA through DD, time recorded photos taken by Charles Gelsinger on his personal camera, which automatically prints on each photo the time and date it was taken.[7]

The photographs indicate that the entire incident took at most 10 minutes. At 2:59 p.m. Officer Lujan is shown walking Bobo, alongside the train. At 3:06 Bobo is photographed exiting the train's 413 coach car with a red ball in his mouth, indicating his reward for a positive sniff[8]. At 3:09 Agent Tate is shown exiting coach car 413 with the maroon suitcase in tow. The black suitcase is photographed on the sidewalk at 3:09 outside coach car 413.

Thus, the photos, in conjunction with the testimony, indicate that in less than ten minutes: Agent Lujan took Bobo into the baggage compartment; Bobo sniffed all the luggage in that compartment, clockwise from left to right, and alerted to the maroon suitcase; Bobo was rewarded with his red ball for the positive alert and taken off the train; the maroon suitcase was removed; Bobo's ball was taken away and he was directed to sniff the entire compartment again beginning at the left and working clockwise; Bobo then alerted to the black suitcase and was given his second reward; the agents then made three announcements at two minute intervals, describing the luggage; and talked to a couple who responded to the description of the luggage; both suitcases were then removed.

The Court finds it unreasonable to expect that each and every passenger on the Amtrac train would be able to hear and respond to the announcements within this short time period.[9] Furthermore, the Court notes that Defendant Florez, a Mexican national utilized a court interpreter throughout these pro-

---

5. The backpack apparently did not have any tags or identification labels on it, unlike Mr. Florez' luggage which was tagged with his name and address taped to the suitcases.

6. It is important to remember that the announcements never called for the owner by name since the agents allegedly could not read the name printed on the luggage at that time.

7. Mr. Gelsinger testified that he spends a lot of time at the train station because he is working on a documentary about the Drug Interdiction Task Force operation. His work often includes taking pictures.

8. Officer Lujan, Bobo's handler, testified that when Bobo alerts he tosses him a red ball as a reward.

9. According to the testimony of Agents Tate and Candelaria, the Amtrac Train had three coach cars, a lounge car, a dining car, and two sleeper cars, consisting of sleeper compartments. Each of the three coach cars had a common luggage area. If the announcement was transmitted throughout the entire train, there was no testimony that the announcement specified which common luggage area on which coach car responses could be made. If the announcement was heard on the other coach cars, passengers in those cars may have responded by going to the common luggage area of the particular car they were on and found no one there.

ceedings and even if he heard the quick announcements, it is not clear he would have understood them since they were broadcast only in English. In addition, the announcements only described the luggage and did not mention Mr. Florez' name.

While it is true that warrantless searches and seizures of abandoned property do not violate the Fourth Amendment, *Abel v. U.S.*, 362 U.S. 217, 241, 80 S.Ct. 683, 698, 4 L.Ed.2d 668 *reh'g denied*, 362 U.S. 984, 80 S.Ct. 1056, 4 L.Ed.2d 1019 (1960)[10], the Court finds that the requisite factors establishing abandonment were not present here.

The government's assertion that Defendant Florez abandoned his privacy interest in his luggage fails as it is not supported in the record nor in case law. The Court finds that the defendant did not abandon his two suitcases and, therefore, has standing to challenge the search of their contents.

## PROBABLE CAUSE

■ Whether or not police obtain a warrant, probable cause is generally required for a search or seizure. *Carroll v. U.S.*, 267 U.S. 132, 155–56, 45 S.Ct. 280, 286, 69 L.Ed. 543 (1925).[11] Defendant Florez contends that any alleged alert by the drug detection canine, Bobo, did not constitute probable cause.[12]

The Tenth Circuit has consistently held that a positive dog alert by a trained narcotics dog, standing alone, is generally sufficient to support a finding of probable cause. *United States v. Ludwig*, 10 F.3d 1523, 1538 (10th Cir.1993); *United States v. Gonzalez–Acosta*, 989 F.2d 384, 388 (10th Cir.1993);

*United States v. Pinedo–Montoya*, 966 F.2d 591, 594 (10th Cir.1992); *United States v. Williams*, 726 F.2d 661, 663 (10th Cir.) *cert. denied*, 467 U.S. 1245, 104 S.Ct. 3523, 82 L.Ed.2d 830 (1984).

■ However, in *Ludwig*, this circuit recognized that a "dog alert might not give probable cause if the particular dog has a poor accuracy record." 10 F.3d at 1538.[13] By doing so, the court joined other circuits who have acknowledged that finding probable cause is contingent on the reliability of the alerting dog. *See United States v. $67,-220*, 957 F.2d 280, 285 (6th Cir.1992) (for a positive dog reaction to support a determination of probable cause, the training *and reliability* of the dog must be established) (emphasis added); *United States v. Spetz*, 721 F.2d 1457, 1464 (9th Cir.) *overruled on other grounds*, *United States v. Bagley*, 765 F.2d 836 (9th Cir.1985) (a validly conducted dog sniff can supply the probable cause necessary for issuing a search warrant *only if sufficient reliability* is established by the application for the warrant) (emphasis added); *United States v. Colon*, 845 F.Supp. 923, 928 (D.P.R. 1994) (lack of evidence in the record pertaining to ... general reliability of the canine unit performing the sniff precludes determination that government has shown probable cause); *Cf. Horton v. Goose Creek Indep. Sch. Dist.*, 690 F.2d 470 (5th Cir.1982) (remanded for trial court to evaluate dog's reliability before determining whether an alert gave rise to reasonable suspicion in civil case) *reh'g denied*, 693 F.2d 524, *cert. denied*, 463 U.S. 1207, 103 S.Ct. 3536, 77 L.Ed.2d 1387 (1983); *See also* 1 Wayne R. LaFave, *Search*

---

**10.** In *Abel*, the court held that the defendant voluntarily abandoned his bag in a motel room wastepaper basket, after he removed his luggage, turned in the key and checked out of the motel, leaving the bag behind.

**11.** A lower standard of reasonable, articulable suspicion of criminal activity has been deemed sufficient where the intrusion on individual privacy is minimal and is outweighed by an important government interest i.e. investigative detention, protective sweeps. This lower standard is inapplicable here.

**12.** The Defendant argues not that dogs cannot accurately smell but rather that they smell too

well: "if a trained narcotics dog is such a sensitive detector that it can detect minuscule amounts of cocaine transferred from paper currency to another object, its detection cannot provide probable cause to believe that drugs are present on or in a given object.... This level of sensitivity destroys the reliability necessary for probable cause to believe a crime has been committed or that a particular individual's property contains drugs." Def.'s Mem.Supp. Suppress at 12.

**13.** The dog in *Ludwig* was deemed reliable because the evidence showed the dog had *never* falsely alerted. 10 F.3d at 1528 (emphasis added).

*and Seizure,* § 2.2(f) (2nd Ed.1987) (in light of the careful training which these dogs receive, an "alert" by a dog is deemed to constitute probable cause for an arrest or search *if a sufficient showing is made as to the reliability of the particular dog* used in detecting the presence of a particular type of contraband) (emphasis added).

Unfortunately, few courts have elaborated upon this important requirement. *See United States v. Diaz,* 25 F.3d 392, 394 (6th Cir.1994) (courts have not definitively addressed the issue of the quality or quantity of evidence necessary to establish a drug detection dog's training and reliability). Thus, there is little guidance for determining reliability.

In *Diaz,* the Sixth Circuit structured the following analysis using evidentiary standards on the admissibility of expert evidence as guidance in determining whether a narcotics dog is sufficiently reliable:

> "When the evidence presented, whether testimony from the dog's trainer or records of the dog's training, establishes that the dog is generally certified ... any other evidence, including testimony of other experts, that may detract from the reliability of the dog's performance properly goes to the "credibility" of the dog. Lack of additional evidence, such as documentation of the exact course of a dog's training, would also detract from the dog's reliability."

25 F.3d at 394.

■ Insofar as it discusses "credibility," this analysis is not helpful when examining the reliability of dog alerts to establish probable cause. The credibility of an expert witness properly goes to the weight his testimony will be given, not to whether he is qualified to testify. *Id.*[14] Also, under this analysis, once a showing of general certification has been made,[15] the burden of establishing probable cause seems to improperly shift from the government to the defendant who is required to come forth with evidence negat-

ing reliability. For these reasons this Court does not follow that analysis.

In the civil context, the Fifth Circuit in *Horton,* remanded to the trial court for inquiry into the reliability of narcotics dogs used in a school district's drug detection program. 690 F.2d at 482. The court stated that the reliability of the alerting dogs had to be established in order to determine if the alerts amounted to reasonable suspicion justifying the search of student lockers and cars. *Id.*

In a subsequent proceeding, the appellate court in *Horton,* gave the following suggestions for determining the dog's reliability: "This is the kind of determination that can be made on the basis of evidence concerning the dog's performance, and perhaps by other methods ... the number of times that a dog alerts when contraband is no longer present, as well as the number of times when it alerts on a perfectly harmless substance, are all factors that go into the determination of reliability. *Horton,* 693 F.2d at 525 (denying a suggestion for rehearing en banc, treated as a petition for panel rehearing) *cert. denied,* 463 U.S. 1207, 103 S.Ct. 3536, 77 L.Ed.2d 1387 (1983).

Professor LaFave states an alert by a dog constitutes probable cause *"if a sufficient showing is made as to the reliability of the particular dog* used in detecting the presence of a particular type of contraband." LaFave, *Search and Seizure* at § 2.2(f) (emphasis added).

> "Various methods of providing an index of the dog's reliability and credibility narrow down to some basic elements. The magistrate should be advised of the following: the exact training the detector dog has received; the standards or criteria employed in selecting dogs for marijuana detection training; the standards the dog was required to meet to successfully complete his training program; the "track rec-

---

14. As applied to expert witnesses: "When an expert has been qualified, other evidence, including the testimony of other experts, that contradicts or undermines the testimony of the expert affects that expert's credibility, not his qualifications to testify." *Diaz,* 25 F.3d at 394.

15. The *Diaz* court did not clarify whether a general showing of certification could be made merely by testimony of the dog's handler that the dog is certified or if performance records on the dog would be required.

ord" of the dog up until the search (emphasis must be placed on the amount of false alerts or mistakes the dog has furnished). Only after this information has been furnished, is a magistrate justified in issuing a warrant."

*Id.* n. 200 (*quoting* Comment, 13 San Diego L.Rev. 410, 416–17 (1976)).

From this limited guidance, it is clear: where the issue has been examined closely, detailed inquiry into a dog's reliability has been considered essential in determining whether an alert amounts to probable cause and even the lesser standard of reasonable suspicion.

This Court is of the opinion that in determining whether Bobo's alert constitutes sufficient probable cause, proper guidance can be found in the traditional probable cause inquiry. Probable cause to search means that "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Ludwig,* 10 F.3d at 1527 (*quoting Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983)). In *Gates,* the Supreme Court established that the existence of probable cause must be determined by the totality of the circumstances surrounding the intrusion. 462 U.S. at 238, 103 S.Ct. at 2332.

▇▇▇ Probable cause may be based on hearsay from a reliable source, *Draper v. U.S.,* 358 U.S. 307, 313, 79 S.Ct. 329, 333, 3 L.Ed.2d 327 (1959), or from an anonymous informant that can be independently corroborated. *Gates,* 462 U.S. at 241, 103 S.Ct. at 233–34. Where an informant has proven to be reliable, his assertions may by themselves be sufficient to establish probable cause. *Id.* at 233–34, 103 S.Ct. at 2329–30. On the other hand, information from an anonymous informant requires corroboration since the credibility and reliability of the unknown source is not readily ascertainable. *See United States v. Sturmoski,* 971 F.2d 452, 457 (10th Cir.1992) (*citing United States v. Harris,* 403 U.S. 573, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971)) (there is no need for a declaration of the reliability of an informant *when the informant's information is corroborated* by other information) (emphasis added). The quest for reliability, inherent in the analysis to determine whether an informant's tip amounts to probable cause was recognized in *Ludwig* and provides guidance in the use of dog alerts as a basis for probable cause.[16]

▇▇▇ A dog alert, like an informant's tip, relays information which may be sufficient to establish "a fair probability that contraband or evidence of a crime will be found in a particular place". *See Gates,* 462 U.S. at 238, 103 S.Ct. at 2332; *Ludwig,* 10 F.3d at 1527. Officer Lujan testified that when Bobo alerts, he is simply telling authorities that he smells an odor that he has been trained to smell.

▇▇▇ In determining whether an informant's report establishes probable cause, the

---

**16.** A direct probable cause inquiry has, on at least one prior occasion, been applied in the context of evaluating a dog alert. In *United States v. Meyer,* 536 F.2d 963 (1st Cir.1976), the First Circuit, applying the since abandoned two-prong Aguilar test for probable cause, determined that an affidavit which stated that a dog was "trained," along with other information, was sufficiently reliable to support the issuance of a warrant. The dog in *Meyer* had alerted to empty containers in the defendants' cabin on a passenger cruise liner. The fact that the dog's positive reaction was augmented by other information in the affidavit is significant because the reviewing court determined the additional information "could lead a magistrate to believe that the information conveyed by the animal's strong "alert" was reliable." *Id.* This other information was that the defendants had been under surveillance by DEA agents; had exhibited "highly suspicious" behavior; and the agents had obtained a sample of cocaine, which one of the defendants

had given the ship's casino manager. "From these facts and the positive reaction to the scent of narcotics in the empty containers by a trained dog, a magistrate could reasonably conclude that there was probable cause." *Id.* 536 F.2d at 966. Thus, it is clear that although the court accepted a mere declaration of the dog's reliability in establishing probable cause, it did so because it was coupled with corroborating information.

Also, in *Meyer,* a warrant was obtained and the *Meyer* court made it clear that it considered the affidavit in its totality and deference was given to the magistrate's finding of probable cause. "It is well-established by now, that in doubtful or marginal cases a search with a warrant may be sustainable while one without it would fail." 836 F.2d at 966. In the present case, there was no warrant and no corroborating information. But, there was evidence of unreliability of the dog, Bobo, used in this case, which was not present in *Meyer.*

informant's veracity or reliability and basis of knowledge is assessed in light of the totality of the circumstances. *Gates*, 462 U.S. at 233, 103 S.Ct. at 2329; *United States v. Corral*, 970 F.2d 719, 726 (10th Cir.1992). Utilizing this analysis to determine whether a positive alert constitutes probable cause, one can evaluate a dog's reliability by a review of well kept records, testimony of the dog's handler and corroborating circumstances when necessary.

█ The fact that a dog is certified should not be sufficient in and of itself to establish probable cause.[17] *See* LaFave, *Search and Seizure*, at § 2.2(f) (setting out some guidance for a sufficient showing of reliability).

Certified dogs have been known to falsely alert. *See Doe v. Renfrow*, 475 F.Supp. 1012 (N.D.Ind.1979), *aff'd in part*, 631 F.2d 91 (7th Cir.1980), *reh'g denied*, 635 F.2d 582 (7th Cir.1980) *cert. denied*, 451 U.S. 1022, 101 S.Ct. 3015, 69 L.Ed.2d 395 (1981) (no drugs found on thirty-three (33) out of fifty (50) junior high and high school students to which narcotics dogs alerted); *United States v. Brown*, 731 F.2d 1491, *modified*, 743 F.2d 1505, *reh'g denied*, 749 F.2d 733 (11th Cir. 1984) (no drugs found after narcotics dog alerted to luggage at airport)[18]; *United States v. Young*, 745 F.2d 733 (2d Cir.1984), *cert. denied*, 470 U.S. 1084, 105 S.Ct. 1842, 85 L.Ed.2d 142 (1985) (no drugs found after narcotics dog alerted to defendant's apartment).

In *Young*, the dog who falsely alerted was named Kane. The defendant in *Young* sought to suppress evidence of firearms found during the search and argued that in order for a search warrant based on a dog alert at an apartment to be valid, the supporting affidavit had to provide details on Kane's track record. Two years earlier in *United States v. Waltzer*, Kane was said to have a "perfect record," and on that basis the Second Circuit concluded that the dog's identification was discriminating and reliable without further investigation into the dog's accuracy. 682 F.2d 370. Once aware of Kane's false alert, the *Young* court characterized Kane's sniff as an "arguably unreliable, or at least unsubstantiated technique." 745 F.2d at 758. The court nonetheless affirmed the conviction after determining that the other information in the affidavit, such as information from independent confidential informants and surveillance, supported probable cause even absent Kane's alert. 745 F.2d at 756.

The dog's false alert in *Young* illustrates that further inquiry into a dog's record and performance is critical in determining whether an alert warrants reliance. Andrew E. Taslitz, *Does the Cold Nose Know? The Unscientific Myth of the Dog Scent Lineup*, 42 Hastings L.J. 17 (1990).[19] The reliability

---

**17.** This Court is mindful that in *United States v. Venema*, this circuit held that a statement in an affidavit that a dog was a "trained, certified marijuana sniffing dog" was sufficient to establish the dog's reliability and support probable cause. 563 F.2d 1003, 1006 (10th Cir.1977) (*citing United States v. Waltzer*, 682 F.2d 370 (2nd Cir.1982) *cert. denied*, 463 U.S. 1210, 103 S.Ct. 3543, 77 L.Ed.2d 1392 (1983)). However, in *Venema* no evidence of false alerts was presented to the court. In addition, in that case the dog's alert was corroborated because the agents were suspicious of the defendant and had him under surveillance prior to having the dog sniff his storage locker. Also, it is worth noting that in *Waltzer*, the case the court relied upon, the alerting dog had a "perfect record." *See* 682 F.2d at 371.

**18.** In *Brown*, the Eleventh Circuit stated: "The Supreme Court has assumed that dog-sniff tests are reliable. The result of the test in this case should perhaps give us pause before making that assumption." 731 F.2d at 1492 n. 1.

**19.** The article criticizes courts who place unqualified reliance on narcotics dogs. In a discussion of the decision in *Waltzer* it states: "reference to Kane's 'perfect record' was meaningless, however, because the court failed to ask any questions about Kane's reliability or skill beyond noting his 'perfect record.' For example, what was Kane's earlier scenting experience? Had he previously alerted to known quantities of cocaine or only to other drugs? Did 'perfect' mean that he had been tested and correct twice, a figure of little value, or had he been correct on hundreds of occasions? Furthermore, were the circumstances of the search in any way suggestive, or were there handler cues that might have caused Kane to identify certain persons even though Kane did not himself recognize the scent of cocaine? The facts of *United States v. Young* illustrate that asking these kinds of questions is critical to identifying those dog sniffs that deserve to be relied upon." 42 Hastings L.J. at 28–29.

of dog alerts has increasingly been questioned in forfeiture proceedings. *See United States v. Carr*, 25 F.3d 1194 (3rd Cir.1994); *United States v. Fifty–Three Thousand Eighty–Two Dollars in United States Currency*, 985 F.2d 245, 250 n. 5 (6th Cir.1993) (and studies cited therein); *United States v. One Gates Learjet*, 861 F.2d 868 (5th Cir. 1988); *United States v. $639,558 in United States Currency*, 955 F.2d 712 (D.C.Cir. 1992). Def.Ex. 1, DEA Study: Report on Trace Analysis of U.S. Currency (date unknown).

Also, the controlled setting of training centers like Global International where narcotics dogs are certified is quite different from actual work in the field. Unlike at a training center, when a narcotics dog alerts to a closed container in the field, no one knows for sure if drugs are present in the container until it is searched, and if searched and no drugs are found, one may never know why the dog alerted.[20]

In addition, Defendant's expert dog-trainer, Robert Dameworth[21], testified that variable factors such as weather conditions, the health of the dog on a particular day, etc., may affect the dogs reliability and may not have been present at the time the dog was certified.[22] In order to make a proper determination of a dog's reliability on a particular sniff, records of the dog's daily activities should include the presence of any of these factors. This is particularly so when the dog alerts and no drugs are found, as this might shed light on the reason the dog alerted.

Officer Lujan testified that he and Bobo have worked as a team since March of 1993, when he attended Global International and was introduced to Bobo. The pair went through a three week training program where they were trained five days a week for eight to ten hours a day. Bobo has a certificate of training from Global and is trained to detect the odor of marijuana, cocaine, heroin, and methamphetamine. Bobo is also trained to detect residual odor which is the lowest scent threshold.

At Global each team had to score at least 80 percent in order to pass the program. When Officer Lujan and Bobo graduated from the academy they had a 94.3 percent accuracy rate. The Albuquerque Police Department sends their narcotics dogs and handlers back to Global for recertification every six months. Officer Lujan and Bobo were recertified in November of 1993 and received a 96.3 percent accuracy rating.

At the suppression hearing, Defendant Florez introduced into evidence Bobo's records which had been subpoenaed prior to the hearing. Officer Lujan testified that along with those records, he was asked to produce separately maintained incident reports which documented all instances where Bobo alerted. Officer Lujan stated that he tried to produce all such reports but because they were kept separately from Bobo's other records (relating to training, health, certification etc.), he could not be sure he located all of them. He further testified that there could be instances where no records were kept, such as when Bobo alerted and no drugs were found.

20. Officer Lujan testified that at training the dog and its handler are given "problems" to complete, where drugs are placed in certain locations and the pair has to find them. Obviously, when a dog alerts in training the instructors know immediately whether the alert is accurate or inaccurate.

21. Mr. Dameworth testified that he has been involved with narcotics detector dogs for the past 23 years, beginning in 1972 when he was in a group selected to pilot a project which examined drug detector dog sciences. He has been trained as a dog trainer since 1968 when he became a sentry dog handler; he has trained his own dogs and has worked as a consultant for at least two police departments and has trained other dog handlers. The Court finds him sufficiently knowledgeable in narcotics detection dogs to testify as an expert in this matter.

22. Mr. Dameworth testified: "dogs are not unlike humans, dogs can have good and bad days just like we can. They can have headaches and stomach aches and everything else and just decide they don't feel like working." (Hr'g Tr. at 160 ln. 10–13.) He also testified that temperature makes a difference in dog alerts. "It does several things to odor and it also does several things to closed containers that have substance in them ... everything from moisture in the air, temperature changes, all of those things make odor strength and intensities change." (Hr'g Tr. at 168, ln. 10–16.)

Indeed, defense counsel brought out four instances where Bobo alerted and no drugs were found which were not among the incident reports produced by Officer Lujan. (*See* hr'g tr. at 105 ln. 8–14; at 106 ln. 3–9; at 107 ln. 2–17; at 108 ln. 15–18; at 108 ln. 15–25 at 109 ln. 1–4; at 109 ln. 14–25; at 110 ln. 1–4; at 110 ln. 9–17; and at 111 ln. 5–17.)

The reports on these four instances were introduced into evidence by the defendant.[23] Officer Lujan subsequently testified that he remembered one additional time when Bobo alerted to a package at United Postal Service and the package was opened and no drugs were found. (*See* hr'g tr. at 112 ln. 18–25; at 113 ln. 1–3; at 112 ln. 13–20.)

The instances brought before the court happened to be instances defense counsel was aware of and the dog handler had forgotten to mention. There could be countless other instances where Bobo alerted and no drugs were found. According to Officer Lujan, it is unlikely that records were kept of those instances. In addition, Officer Lujan did not obtain records of all Bobo's sniffs. He only obtained certain reports that he remembered and only those where people were arrested.[24]

The testimony elicited from Officer Lujan did little to establish Bobo's reliability or

clarify his record.[25] At the hearing, Officer Lujan testified on direct examination that in their tour of the Albuquerque train station, Bobo had positively alerted to about 15–20 bags out of 2,000 bags which they had examined. (Hr'g Tr. at 93 ln. 23–25; at 94 ln. 1–4.)

Later, on cross-examination, Officer Lujan testified that Bobo had alerted at the train station about 20–30 times and each time the subsequent search revealed drugs. (Hr'g Tr. at 116 ln. 15–25; at 117 ln. 1.)

On recross examination, Officer Lujan was reminded that he had already acknowledged at least one instance at the train station, and several others elsewhere, where Bobo had alerted and no drugs were found and that evidence of that alert was before the Court. (Hr'g Tr. at 119 ln. 13–22.)

The Court finds this testimony inconsistent and not sufficiently credible to establish Bobo's reliability. Further, the testimony demonstrates the difficult if not impossible task of remembering a dog's daily activities, including false-positive and accurate-positive alerts, without written documentation. It is also significant in that it demonstrates the vital importance of maintaining accurate records on each and every alert Bobo makes—whether an accurate-positive alert which re-

---

**23.** Ex. G: Report dated 1/15/94—dog alerted to luggage at the train station where no drugs were found.

Ex. H: Report dated 1/4/94—dog alerted to locker at bus station where no drugs were found.

Ex. I: Report dated 10/8/94—dog alerted to car where no drugs were found.

Ex. J: Report dated 9/24/93—dog alerted to gas tank of vehicle where no drugs were found.

**24.** Q. So we don't have all of Bobo's reports here, do we?

A. As much as I could get, that I remember.

Q. But in order to have all of them you would have had to go back through all the search warrants, isn't that right?

A. Yes, ma'am.

Q. And you would have to go back through all the DEA–6s?

A. Yes.

Q. And then there might be times when there weren't any reports; right, if—

A. —Yes.

Q. —Bobo alerted and they didn't find anything, there might no be a report.

A. Yes.
(Hr'g Tr. at 104 ln. 9–23.)

A. I didn't even try to pull up the search warrants because there is no way I could have done it, and I just tried to pull up certain reports, just reports that were written where people were arrested ...
(Hr'g Tr. at 111 ln. 23–25; at 112 ln. 1–2.)

**25.** With regard to these five false alerts, Officer Lujan testified: When Bobo alerted to the luggage no drugs were found, only money; when Bobo alerted to the locker, no drugs were found but drugs were found on the defendant when he was arrested; when Bobo alerted to the vehicle, there may have been drugs in the trunk but he didn't know if "there was residue, smoke or what" but there was nothing he could basically see; when Bobo alerted to the gas tank, he was actually alerting to a rubber hose connected to the tank which had white stuff on it but he couldn't say if it was residue or not; finally, when Bobo alerted to the package at UPS, no drugs were found and he couldn't explain why Bobo alerted. Hr'g Tr. at 117–18.

sults in the seizure of drugs or a false-positive alert where no drugs are found.

Defendant's expert, Mr. Dameworth, testified that because narcotics dogs are trained to alert to purely residual molecular odor, the maintenance of records for both training purposes and actual utilization is critical. He concluded that Officer Lujan failed to keep sufficient records.

Without these records, the government was unable to explain the number of false alerts brought to the Court's attention. The fact that Officer Lujan recalled these instances, only after they were brought to his attention by the defendant, causes the Court to wonder how many other times Bobo may have falsely alerted where no records exist because criminal prosecution was not initiated.

Indeed, Officer Lujan testified that as a result of these proceedings and others like them, he has started keeping much more thorough records in order to better establish Bobo's reliability when called upon to do so in the future. Officer Lujan now daily records all of Bobo's activities including each time he alerts, whether or not drugs are found.

The Court finds Officer Lujan's previous method and scope of record keeping insufficient to establish Bobo's reliability. Without sufficient documentation to bolster Bobo's performance, Officer Lujan's testimony about Bobo's reliability and performance in the field was not credible as it was based on his admittedly limited and sketchy recollection.

■■ Where documentation on a narcotics dog is absent or incomplete, a proper evaluation of a dog's reliability cannot take place. *See Horton,* 690 F.2d at 470 (holding assertion that dogs were "quite reliable" insufficient where no comprehensive records kept of those incidents where dogs' falsely alerted and remanding for a development of the record on the dogs' reliability). At best, the showing of reliability is deficient. However, such a deficiency may not be fatal to a finding of probable cause where there are corroborating circumstances.

Veracity and basis of knowledge are not rigid and immovable requirements in the finding of probable cause because a deficiency in one element may be compensated for "by a strong showing as to the other, or by some other indicia of reliability" *Corral,* 970 F.2d at 719. In *Corral,* the other index of reliability was corroboration: the informant had proven reliable in the past; he had good motive to give accurate information; and the information was corroborated by police investigation and surveillance.

■■ The importance of corroboration has been consistently recognized by the Supreme Court in applying the totality of the circumstances analysis. *Gates,* 462 U.S. at 241, 103 S.Ct. at 2333–34. Corroboration can likewise bolster a dog sniff where the dog's reliability has been successfully challenged and there are insufficient records to rehabilitate it. A weak showing in reliability could be compensated for by a strong showing of corroboration.

The Tenth Circuit recognized this in *United States v. Nielsen,* where the court stated: "if this were a case of an alert by a trained drug sniffing dog *with a good record,* we would not require corroboration to establish probable cause." 9 F.3d 1487, 1491 (1993) (emphasis added). Implicit in this statement is that corroboration is necessary to substantiate an alert by a dog with a poor record. *See also United States v. Spetz,* 721 F.2d 1457, 1464 (9th Cir.1983) (dog alert found sufficient to establish probable cause particularly since the dog's alert was *independently corroborated* by the alert of another dog) (emphasis added); *Waltzer,* 682 F.2d at 371–72 (dog alert found sufficient to establish probable cause where dog Kane had a record of *100 percent* accuracy *in the field* and the dog's alert was *coupled with independent evidence,* including police officer's observations and determination that defendant fit drug courier profile) (emphasis added).

In cases such as this, where documentation of a dog's daily field activities are not kept, it is impossible to rehabilitate a dog's apparently unreliable performance record, when it is the sole basis for probable cause, without corroboration.

The Court recognizes that where an officer finds it necessary to search one's property

without a warrant, based solely on a narcotic dog's alert, as was done here, the dog's records may not be immediately accessible. However, the dog's handler is routinely present to inform the officer of the dog's performance record in the field. If on previous occasions the dog has alerted and no drugs were found, the handler could so inform the officer, who would then be encouraged to seek out corroborating information to further support probable cause. The dog's records would be available if the officer's determination of probable cause is challenged in subsequent court proceedings.[26]

Here, the DEA agents relied solely on Bobo's alert to establish probable cause and presented no corroboration or "other indicia of reliability." The Court having found Bobo to be unreliable and there being no other corroborating evidence or "indicia of reliability" to provide the basis for probable cause, concludes that the warrantless search of defendant's suitcases violated the Fourth Amendment.

In summary, where adequate and comprehensive records are maintained on a particular narcotics dog, and include results of controlled alerts made in training, as well as actual alerts in the field, the dog's reliability could be sufficiently established either through the records themselves or testimony from the dog's trainer who maintained the records. In this respect, the dog's alert is analogous to information provided by a reliable informant, and his alert without more could establish probable cause.

However, where records are not kept or are insufficient to establish the dog's reliability, an alert by such a dog is much like hearsay from an anonymous informant, and corroboration is necessary to support the unproven reliability of the alerting dog and establish probable cause. To accept less would compromise the very principles that the requirement of probable cause was designed to protect.

The Court having found (1) that the defendant did not abandon his luggage and therefore has standing to challenge the search of his luggage; and (2) that Bobo's reliability

was not established and therefore could not support probable cause, the defendant's suitcases were searched in violation of the Fourth Amendment.

THEREFORE, the evidence obtained in the unlawful search must be suppressed.

WHEREFORE, it is ordered that Defendant's Motion to Suppress is **granted.**

---

**26.** Ideally, in conformance with the warrant requirement, the dog's records would be presented to a neutral magistrate for a determination of probable cause.