**UNITED STATES of America**

v.

**Freeman Charles OUTLAW**

**No. P–00–CR–198.**

United States District Court,
W.D. Texas,
Pecos Division.

March 14, 2001.

Kelly Wayne Loving, Assistant U.S. Attorney, Alpine, TX, for Government.

Charlotte Harris, Assistant Federal Public Defender, Alpine, TX, for Defendant.

## ORDER ADOPTING FINDINGS AND RECOMMENDATION OF MAGISTRATE JUDGE AND DENYING DEFENDANT'S MOTION FOR A *DAUBERT* HEARING AND MOTION TO SUPPRESS EVIDENCE

FURGESON, District Judge.

Before the Court is the Magistrate Judge's Proposed Findings of Fact and Recommendation, filed November 16, 2000,

in the above-styled matter. The Defendant filed specific objections to the findings on January 8, 2001. After conducting a *de novo* review, the Court is of the opinion that the Defendant's Motion for *Daubert* Hearing and Motion to Suppress Evidence and should be DENIED.

## STANDARD OF REVIEW

A district court reviews *de novo* a magistrate judge's report and recommendations when either party makes specific objections within ten days of receipt of the report. 28 U.S.C. § 636(b)(1). If no objections are filed, the court reviews for findings and conclusions that are either clearly erroneous or contrary to law. *United States v. Wilson,* 864 F.2d 1219 (5th Cir.1989). The Defendant timely filed specific objections and, therefore, this Court conducts a *de novo* review of the Magistrate Judge's report and recommendations.

### Facts and Procedural History

On April 21, 2000, the Defendant Freeman Charles Outlaw was a passenger on a Greyhound bus that was stopped at the Sierra Blanca checkpoint. Border Patrol Agent Marquez boarded the bus and conducted an immigration inspection of the passengers. At the same time, Border Patrol agent Navarro conducted a canine inspection of the bus's cargo area. Gerri, the canine used for the inspection, alerted Agent Navarro, Gerri's handler, to a black, hard-shelled suitcase. Attached to the suitcase was a claim tag with the name "O. Freeman." After none of the passengers came forward to claim the suitcase, agents conducted a physical inspection of the passengers' tickets to determine the suitcase's owner. Agent Navarro identified the Defendant as having the ticket matching the claim stub for the suitcase.

The Defendant was asked to step off the bus and was questioned about the suitcase. According to Agent Navarro, the Defendant stated that the suitcase contained only clothes. Agent Navarro also testified that the Defendant agreed to allow the agents to search the suit case. The suitcase, however, was locked and Defendant told Agents that he did not have the combination to the suitcase's lock. Agent Navarro then proceeded to open the suitcase using a pocket knife. A search of its contents uncovered two, one gallon plastic jars containing, what field tests revealed to be, PCP. Agents then placed the Defendant under arrest.

Defendant moved to suppress the evidence uncovered as part of the April 21, 2000 stop arguing several violations of his constitutional rights. First, the Defendant argues that his continued detention at the checkpoint after the completion of the immigration inspection amounted to an illegal detention and seizure. Second, the Defendant contends that the canine inspection was an unlawful search. Third, the Defendant asserts that the physical search of his luggage violated his Fourth Amendment rights because it was done without a warrant, probable cause, or his valid consent. Finally, the Defendant argues that he was interrogated without presence of counsel in violation of his Sixth Amendment right to counsel. In addition, the Defendant filed a Motion for a *Daubert* Hearing to challenge the qualifications and reliability of Gerri, the dog used in the canine search.

The Defendant's Motion to Suppress Evidence and Motion for a *Daubert* Hearing were referred to United States Magistrate Judge L. Stuart Platt by order of this Court filed September 6, 2000. A hearing was held before the Magistrate Judge on October 3, 2000. After careful consideration of the Defendant's Motions, case law, and evidence, the Magistrate Judge issued a recommendation that both of the Defendant's Motions be denied. The Defendant timely filed specific objec-

tions to the Magistrate Judge's recommendation. Though Defendants makes numerous objections, they fall into several broad categories: (1) the Magistrate Judge erred in his determinations and findings of fact relating to the issue of the reliability of the canine alert that led to the continued detention of the bus and the eventual search of Defendant's suitcase; (2) the Magistrate Judge erred in determining that the continued detention of the bus and its passengers by Border Patrol Agents after the completion of the immigration inspection did not violate Defendant's Fourth Amendment right against unreasonable seizures; and (3) the Magistrate Judge erred in finding that the Defendant gave his valid consent for Border Patrol agents to search his suitcase.

The Court now conducts a *de novo* review of the issues and findings specifically objected to by the Defendant.

## DISCUSSION

### I. Defendant's Motion for a *Daubert* Hearing and Objections to the Reliability of the Canine Inspection

**A. *Daubert* hearing is not the appropriate procedural vehicle to challenge the reliability of a canine inspection.**

The Defendant filed a Motion for a *Daubert* Hearing pursuant to FED. R. EVID. 104(a). The Defendant's proffered purpose for a *Daubert* hearing is to determine whether the government may call any witness to testify about the canine alert. In actuality, the Defendant seeks to challenge the reliability of Gerri and the handler, Agent Navarro, so as to prove that Agent Navarro did not have probable cause to continue to detain the passengers nor to conduct a search of the Defendant's suitcase.

■ A *Daubert* hearing is the wrong procedural vehicle through which to challenge the reliability of a canine alert. A

*Daubert* hearing presupposes that "the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact issue." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). The purpose of a *Daubert* hearing is to determine whether expert testimony meets the threshold of reliability so that the trier of fact may rely on such testimony to determine a fact issue. An example of a fact issue embraced by *Daubert* is whether or not a certain chemical caused a plaintiff to develop cancer. In contrast, the purpose of allowing Agent Navarro to testify that Gerri alerted to the black suitcase is not to prove that the chemicals found were actually an illegal narcotic; rather, the testimony is intended to establish that Agent Navarro had an articulable basis for believing that the suitcase contained contraband items and that the owner was involved in illegal activity. It is not a fact issue as contemplated under *Daubert*. Therefore, a *Daubert* hearing is not warranted. Instead, the Court will directly address the Defendant's challenge to the reliability of the canine alert.

**B. The canine inspection team was trained and reliable for the purpose of establishing probable cause.**

At the evidentiary hearing, Agent Navarro described the training procedures that Gerri and he underwent at the United States Border Patrol National Canine Facility located in El Paso, Texas. According to Agent Navarro, canines complete approximately four weeks of training prior to being paired with a handler. Once the canine is paired with a handler, both the handler and the canine undergo an additional two weeks of training as a team. The canine and handler team must then successfully pass a certification test before being placed in the field. Agent Navarro

testified that, pursuant to these procedures, he and Gerri received certification for the detection of concealed humans, cocaine and its derivatives, marihuana and its derivatives, heroin and its derivatives and methamphetamine on March 15, 2000. However, Agent Navarro acknowledged that Gerri and he were not certified to detect the presence of PCP, the controlled substance found in the Defendant's suitcase. In addition, as Defendant points out, Agent Navarro lacked specific knowledge regarding the training procedures including the minimum quantity of drug for which the dog is trained to detect, what distractions were used during certification and training searches and whether controlled negative testing was conducted during training that would indicate the number of false positives Gerri had during training.

The Defendant further challenged the reliability of the canine inspection team with testimony from his expert witness Dr. Dan Craig, D.V.M. A central theme of Dr. Craig's testimony was that the reliability of a particular drug dog could be determined only if records of both the dog's training and success and failure rate in the field are maintained. Prior to the evidentiary hearing held before Magistrate Judge Platt on October 3, 2000, Defendant filed a *Brady* request asking for any training records for Gerri. This request was denied. At the hearing, Agent Navarro testified that he did not keep field records of Gerri's actual success and failure rate, specifically, of the instances of false alerts. Since there were no training or field records to examine, it was Dr. Craig's opinion that it was not possible to establish Gerri' reliability as a drug detection dog. Defendant argues that the government's failure to produce training records and field work record for Gerri and Agent Navarro preclude a finding that the canine alert was reliable. Absent this showing of reliability, the Defendant contends that the alert in this case was insufficient to establish probable cause. The Court disagrees.

**1. The reliability of a canine alert may be challenged for the purpose of proving that agents did not probable cause to conduct a search or seizure.**

 To be clear, in so far as the Defendant argues that the canine inspection in this case constituted an "illegal search," the Defendant's objection is misplaced. The law is clear that canine inspections are not searches within the meaning of the Fourth Amendment. *See, e.g., United States v. Dovali–Avila*, 895 F.2d 206, 207 (5th Cir.1990). Generally, an alert by a dog properly trained to detect drugs or firearms is sufficient, by itself, to establish probable cause to search the item alerted. *See, e.g., United States v. Dovali–Avila*, 895 F.2d 206, 207 (5th Cir.1990). The threshold question raised by the Defendant's objections is whether the reliability of a canine alert can be challenged so as to defeat probable cause that is based on that alert.

The Fifth Circuit seemed to address this question in *United States v. Williams*, 69 F.3d 27 (5th Cir.1995). The defendant in *Williams* was pulled over for a routine traffic violation. A canine inspection alerted the officer to a false panel. A search revealed crack cocaine and a firearm. The defendant moved to suppress the evidence uncovered as a result of the canine alert. The issue presented on appeal was "whether a dog sniff can 'establish probable cause in a warrantless search without showing evidence of the dog's training and reliability.'" *Id.* at 27. The Court of Appeals answered this question in the affirmative, reasoning that "[b]ecause a showing of the dog's reliability is unnecessary with regard to obtaining a search warrant, *a fortiori*, a showing of the dog's reliability is not required if probable cause is developed on

site as a result of a dog sniff of a vehicle." *Id.* at 28 (citing *United States v. Daniel,* 982 F.2d 146 (5th Cir.1993)).

This Court does not interpret *Williams* as establishing a rule that a defendant has no legal basis to challenge the reliability of a canine inspection team. Nor does the Court apply *Williams* and *Daniel* to create a *per se* rule that an alert by a drug dog always establishes probable cause; rather, a canine alert by a properly trained dog is prima facie proof that the officer had probable cause for a search or seizure. This reading of *Williams* conforms to the Supreme Court's decision in *Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). In affirming that probable cause is determined by an examination of the totality-of-the-circumstances and not by an application of a fixed set of factors, the Court emphasized that: "[P]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rule.... Rigid legal rules are ill-suited to an area of such diversity. One simple rule will not cover every situation." *Gates,* 462 U.S. at 232, 103 S.Ct. 2317 (citation omitted).

Accordingly, the Court finds that the government need only prove that the canine unit was trained and certified in order to prove the reliability of the canine alert so as establish probable cause. However, the Defendant may still challenge the reliability of the canine inspection, but he has the burden of showing that in the "totality of the circumstances" the canine alert was unreliable and insufficient to establish probable cause. In effect, the Defendant not only has the right to challenge the reliability of a drug, but he also carries the burden of proving that claim.

This conclusion is a result of a careful consideration of the literature and the case law dealing with canine alerts. All circuits hold that a positive alert by a drug detection dog is, in the very least, strong proof of probable cause. *Resendiz v. Miller,* 203 F.3d 902, 903 (5th Cir.2000) ("[a] drug-sniffing canine alert is sufficient, standing alone, to support probable cause for a search." ); *United States v. Blaze,* 143 F.3d 585, 592 (10th Cir.1998) ("Once a dog alerts to a container, probable cause exists to open and search it."); *United States v. Diaz,* 25 F.3d 392, (6th Cir.1994) ("A positive indication by a properly trained dog is sufficient to establish probable cause for the presence of a controlled substance."); *United States v. Ludwig,* 10 F.3d 1523, 1527 (10th Cir.1993) ("[A] dog alert usually is at least as reliable as many other sources of probable cause and is certainly reliable enough to create a 'fair probability' that there is contraband.").

Underscoring these decisions is the requirement that the canine and handler team have successfully completed a minimum level of drug detection training and that the team possess a certain level of reliability. Under such circumstances, a handler can reasonably conclude that contraband items will be found based on a canine alert because such "dogs *are trained* to alert—take a particular position or stance—only when they detect such contraband or people." *Dovali–Avila,* 895 F.2d at 207 (emphasis added) ("When a dog *so trained* alerts in the near presence of a particular vehicle, that action is sufficient to give rise to probable cause to search that vehicle."); *United States v. Sundby,* 186 F.3d 873, 876 (8th Cir.1999) (emphasis added) ("A dog's positive indication alone is enough to establish probable cause for the presence of a controlled substance *if the dog is reliable.*"); *United States v. Ludwig,* 10 F.3d 1523, 1528 (10th Cir.1993) (recognizing that a canine alert might not establish probable cause if the canine unit had high number of false alerts); *United States v. Massac,* 867 F.2d

174, (3rd Cir.1989) (affirming a district court's finding of probable cause in light of the district court's determination that the "particular dog met the training and reliability requirements"). Rather than adopting a bright line rule that a canine alert automatically establishes probable cause, the majority of circuits recognize a defendant's right to challenge the training and reliability of canine inspection teams.

In addition, foreclosing a defendant's right to challenge the reliability of a canine alert runs counter to the reality that, though highly accurate, canine inspections are not infallible means of detecting the presence of contraband items. *See* Robert C. Bird, *An Examination of the Training and Reliability of the Narcotics Detection Dog,* 85 KY. L.J. 405, 421–31 (1997) (noting some of the empirical evidence showing instances of low accuracy by canine inspections and examining the factors that cause such errors). The reliability of the canine alert depends significantly on the ability and reliability of the human handler. As such, it is susceptible to human errors. As one author notes:

> A handler must be able to properly interpret a canines subtle signals. In fact, almost all erroneous alerts originate not from the dog, but from the handler's misinterpretation of the dog's signals.

Bird, 85 KY. L.J. at 422–23. A false alert can result from the handler's conscious or unconscious signals given by the handler that lead a dog to where the handler suspects contraband items to be located. *Id.* at 424. As the D.C. Circuit noted: "[W]e are mindful that less than scrupulously neutral procedures, which create at least the possibility of unconscious 'cuing', may well jeopardize the reliability of dog sniffs." *United States v. Trayer,* 898 F.2d 805, 809 (C.A.D.C.1990).

In fact, a canine "alert" is not always an objectively verifiable event. In some instances, an alert is simply an interpretation of a change in the dog's behavior by a human handler. *See Dovali–Avila,* 895 F.2d at 207 (describing that a trained dog alerts to contraband items merely by taking "a particular position or stance"); *Trayer,* 898 F.2d at 808 (declining to find drug dog unreliable based merely on dog's unusual form of alerting given that handler was able to interpret dog's behavior as an alert). Furthermore, because drug dogs are trained to detect even minute amounts of narcotics, the spread of trace amounts of drugs especially in currency increases the likelihood of false alerts. *See United States v. $30,0600,* 39 F.3d 1039, 1041–42 (9th Cir.1994) (citing the numerous federal cases where courts have questioned "the probative value of positive dog alerts due to the contamination of America's paper money supply with narcotics residue"); *see also,* Andy G. Rickman, Note, *Currency Contamination and Drug–Sniffing Canines: Should Any Evidentiary Value be Attached to a Dog's Alert to Cash?,* KY. L.J. 199, 200–209 (1997) (discussing the numerous studies indicating that any where from 70 %—90 % of U.S. currency would test positive for drug and residue).

The Court recognizes that generally a canine inspection by a properly trained dog and handler is one of the most accurate methods of detecting concealed contraband items. *United States v. Place,* 462 U.S. 696, 707, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983) (recognizing canine alerts by trained dogs as one of the most reliable forms of drug detection). However, the possibility of error exists and, in limited circumstances, the error may be of such magnitude that a canine alert is not sufficient to establish probable cause. For instance, it stretches the bounds of jurisprudential imagination to believe that a positive alert by an untrained dog or by a dog with an extensive history of false positive alerts could be relied upon to establish probable cause without raising Fourth

Amendment concerns. Accordingly, though this Court believes that the Border Patrol agents of the Western District are among the most competent and most fair-minded law enforcement officers in the nation, the Court is reluctant to fashion a holding that bars future defendants from raising the possibility of such errors or that creates the potential for a declaration of a "canine alert" to become a conduit for suspicionless and warrantless searches and seizures.

**2. Government established that the canine inspection was reliable so as to support a finding of probable cause.**

■ At least one circuit has developed the doctrine that in order for a canine alert to support a determination of probable cause, the government must prove the training and reliability of the dog. *Diaz,* 25 F.3d at 394 ("For a positive drug reaction to support a determination of probable cause, the training and reliability of the dog must be established."). In *Diaz,* the defendant consented to a search of his car after a canine inspection team alerted to his car. Marijuana was subsequently found and the defendant was arrested. The defendant moved to suppress the evidence arguing that the government failed to establish the dog's training and reliability, and, thus, the agents lacked probable cause to search his car. *Id.* at 393. The Sixth Circuit noted the lack of case law guidance on the question of what evidence and testimony was sufficient to establish a canine inspection team as trained and reliable. *Id.* at 394. It concluded that once the government establishes that the canine inspection team is generally certified for drug detection, any other evidence, such as testimony of other experts or field work records reflecting the canine inspection team's inaccuracy, could be used to attack the reliability and training of the canine inspection team. *Id.* The absence of field work records similarly would affect the dog's reliability but is not dispositive on

the issue. *Id.* Making the final determination as to whether the canine inspection team met the training and reliability standard to support a finding of probable cause is committed to the sound discretion of the district court. *Id.*

Though the Fifth Circuit declined to adopt the standard set-out in *Diaz,* this Court does not interpret *Williams* as saying that a drug dog need not be "trained and reliable" in order for an alert to establish probable cause. *Williams,* 69 F.3d at 28. The most logical reading of *Williams* is that once the government proves that canine inspection team was trained to detect contraband items, the government does not have the additional burden of producing field work records or detailed training records in order to establish the reliability of the canine alert. The defendant may, however, still challenge the reliability of the canine inspection with evidence showing unreliability. Whether a canine inspection team is sufficiently trained and reliable to establish probable cause is left to the sound discretion of the trial judge.

In light of the evidence and testimony presented at the evidentiary hearing, the Court finds that the canine team of Gerri and Agent Navarro was sufficiently trained and reliable so that a canine alert established probable cause. There is no dispute that the team underwent the training procedures standard for drug detection dogs used in by Border Patrol agents and that the team was certified to detect the presence of a variety of drugs including cocaine, heroine, and marihuana.

That the suitcase later turned out to contain PCP, which Gerri was not trained to detect, does not by itself extinguish probable cause. *Cf. United States v. Chronister,* 1995 WL 547815 *3 (10th Cir. 1995) (unpublished) ("[O]ne false alert does not undermine [drug detection dog's] relia-

bility to the extent that it [is a] must for this court to hold that his alerts did not continue to provide probable cause."). First, drug detection dogs such as Gerri are trained to detect a narcotic's odor, not necessarily its physical presence in terms of a seizable amount. Accordingly, the absence of a seizable amount of cocaine, marihuana, or heroine, for which Gerri was trained to detect, does not conclusively indicate that the suitcase and its contents were not previously exposed to such drugs. *United States v. Kennedy,* 131 F.3d 1371, 1375 n. 6 (10th Cir.1997). In fact, it is likely, if not highly probable, that a person who smuggles in one type of drug has had contact with other types of drugs so that a trained dog would detect its odor. As the Tenth Circuit noted:

> A false alert occurs when no seizable amounts of contraband are located during a search. However, a false alert does not mean necessarily that the dog alerted without detecting any odor of narcotics. Dogs are capable of detecting narcotics residue that may appear on money or clothing that has come in contact with drugs, even though no seizable quantity has been found.

*Id.* Furthermore, even if Gerri's alert was truly erroneous, this error does not necessarily undermine the fundamental requirement of probable cause, that is, that the officer had a reasonable suspicion that the suitcase contained *some* type of contraband. *Cf. United States v. McCranie,* 703 F.2d 1213, 1218 (10th Cir.1983) (holding that dog's alert "gave the officers reasonable suspicions that the bag contained contraband" even though the dog was only formally trained to detect explosives and the search based on the alert revealed only narcotics). Hindsight may be twenty-twenty, but whether probable cause existed at the time of the search may not be determined by what the search actually yields. It is a basic tenet of the Fourth Amendment that "a search is not to be

made legal by what it turns up." *United States v. Di Re,* 332 U.S. 581, 595, 68 S.Ct. 222, 92 L.Ed. 210 (1948). Likewise, a search is not made illegal by what it fails to turn up. As the Supreme Court emphasized, "In law [a search] is good or bad when it starts and does not change character from its success." *Id.; United States v. Johnstone,* 574 F.2d 1269, 1273 (5th Cir.1978) (finding that unconstitutional search based on unfounded suspicion was not made constitutional merely because search revealed contraband items). Accordingly, the Court finds that Agent Navarro had an articulable and particularized suspicion that the suit case contained contraband items even though the resulting search suggests that Gerri may have alerted to narcotics for which she was not trained to detect.

In addition, the fact that Agent Navarro did not know the details of Gerri's training and that the Border Patrol does not maintain field work records are not fatal to a finding that the canine team was trained and reliable in light of the other evidence. *Sundby,* 186 F.3d at 876 ("To establish the dog's reliability, the affidavit need only state the dog has been trained and certified to detect drugs."); *Dovali–Avila,* 895 F.2d at 207 (holding that so long as canine is trained to detect contraband items, positive alert is sufficient to establish probable cause); *Diaz,* 25 F.3d at 397 ("While training and performance documentation would be useful in evaluating a dog's reliability, here the testimony of [handler] sufficiently established the dog's reliability."); *United States v. Hill,* 195 F.3d 258, 273 (6th Cir. 1999) (determining that government's failure to produce records detailing the dog's training or field work records does not reverse district court's finding of reliability given evidence detailing the training completed by both the dog and the handlers and the certification procedures and post-certification training); *see also $67,220.00,*

957 F.2d at 285–86 (emphasis added) (determining that probable cause was not established since government failed to present *any* evidence as to the drug dog's reliability and any testing of the drug dog's performance). In light of the evidence developed during the evidentiary hearing and the absence of any proof that the canine team was unreliable or inadequately trained, the Court finds that the canine team was sufficiently trained and reliable and their alert was sufficient to establish probable cause to search the suitcase.

## II. The continued detention of the Defendant after the completion of the immigration inspection did not violate the Fourth Amendment.

The Defendant questions the constitutionality of his continued detention at the Sierra Blanca checkpoint by Border Patrol agents after they had completed their immigration inspection. This continued detention for the purpose of discovering the owner of the suitcase and to gain the Defendant's consent to search the suitcase, the Defendant argues, amounts to an illegal detention of the Defendant and any evidence uncovered as a result of this illegal detention must be suppressed as "fruit of a poisonous tree." The Court disagrees.

■■ Requiring motorists and passengers to stop at fixed checkpoints constitutes a "seizure" within the meaning of the Fourth Amendment. *See, e.g., United States v. Martinez–Fuerte,* 428 U.S. 543, 556, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976). However, the initial stop of the bus at the Sierra Blanca checkpoint did not violate Defendant's Fourth Amendment rights. At permanent border checkpoints, Border Patrol agents are allowed to effectuate brief, suspicionless and warrantless seizures of motorists and passengers for the purpose of verifying immigration and citizenship documentation. *Martinez–Fuerte,* 428 U.S. at 566–67, 96 S.Ct. 3074. Defen-

dant, however, challenges the continued detention of the bus for purposes other than routine immigration questioning.

### A. Detaining the passengers in order to determine the owner of the suitcase was within the scope of the Border Patrol agents' authority.

■ The enforcement power of Border Patrol agents are set out in 8 U.S.C. § 1357. Subsection (5) gives agents general powers to make arrest:

> (A) for any offense against the United States, if the offense is committed in the officer's presents, or

> (B) for any felony cognizable under the laws of the United States, if the officer has reasonable grounds to believe that the person to be arrested has committed or is committing such a felony

if the officer or employee is performing duties relating to the enforcement of the immigration laws at the time of the arrest and if there is a likelihood of the person escaping before a warrant can be obtained for his arrest.

8 U.S.C. § 1357(5); *United States v. Espinoza–Santill,* 976 F.Supp. 561, 565 (W.D.Tex.1997) (discussing the arrest powers of Border Patrol agents under 8 U.S.C. § 1357). In addition, although the primary task of Border Patrol agents is the enforcement of immigration law, Border Patrol agents are also authorized to enforce narcotics laws. 21 U.S.C. § 873(b), 965. This authority includes (1) making arrests in the enforcement of the Controlled Substances and the Controlled Substances Import and Export Act; (2) conducting warrantless searches for evidence incident to the arrest in the enforcement of the Acts; and (3) making seizures of the controlled substances and/or property pursuant to the provisions of the Acts. *Id.; See also, United States v. de La Rosa–*

*Valenzuela,* 993 F.Supp. 466, 468 (W.D.Tex.1997) (discussing the scope to which United States Border Patrol agents are authorized to enforce narcotics laws).

In this context, if a Border Patrol agent discovers evidence of a narcotics violation during a lawful immigration stop, the agent is allowed to act upon that evidence. *United States v. Muniz–Melchor,* 894 F.2d 1430, 1437 (5th Cir.1990) (citation omitted) ("[t]he law does not require the police to ignore evidence of other crimes in conducting legitimate roadblocks."). This is true even if the actual subjective intent of the agent for conducting an immigration stop is to investigate the possibility of drug law violations. *Whren v. United States,* 517 U.S. 806, 813, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996) (holding that, under the Fourth Amendment, an officer's subjective intent is irrelevant if there are objective factors justifying a stop). As this Court has noted in a previous opinion, "an agent can, and should be, very vigilant in trying to ferret out illegal activity within the confines of the law." *Espinoza–Santill,* 976 F.Supp. at 570.

## B. Border Patrol agents had probable cause to detain the passengers.

With very limited exception, a law enforcement agent may stop a vehicle and its passengers without a warrant if the agent has probable cause to stop the vehicle or, lacking probable cause, if the agent has a particularized or articulable suspicion of criminal activity. *See, e.g., Terry v. Ohio,* 392 U.S. 1, 21–22, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Probable cause means "a fair probability that contraband or evidence of a crime will be found." *United States v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989). Probable cause does not require proof beyond a reasonable doubt. It only requires a showing of the probability of criminal activity. *United States v. Daniel,* 982 F.2d 146, 151 (5th Cir.1993).

According to *Terry,* even in the absence of probable cause, law enforcement officers may stop persons and detain them briefly in order to investigate a reasonable suspicion that such persons are involved in criminal activity. *United States v. Tapia,* 912 F.2d 1367, 1370 (11th Cir.1990). In essence, this reasonableness standard requires that law enforcement agents "be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry,* 392 U.S. at 21, 88 S.Ct. 1868. The level of suspicion required for at a investigatory *Terry* stop is less demanding than that for prolonged stop based on probable cause. *United States v. Montoya de Hernandez,* 473 U.S. 531, 541, 544, 105 S.Ct. 3304, 87 L.Ed.2d 381 (1985).

■ As discussed above, the canine inspection and the resulting alert to the suitcase established probable cause for the agents to believe that the suitcase contained contraband items and that the owner of the suitcase was engaged in illegal activity. *See, e.g., Dovali–Avila,* 895 F.2d at 207 (recognizing that an alert by a dog properly trained to detect drugs or firearms is generally sufficient to establish probable cause to search the item alerted). Based on the alert, the agents had probable cause to not only search the suitcase but to detain the passengers in order to determine the owner of the suitcase.

Alternatively, if a positive canine alert is generally sufficient to establish probable cause, *a fortiori,* it is sufficient to give Border Patrol agents an articulable suspicion that a passenger on the bus was involved in criminal activity. As such, the brief detention of the bus and its passengers for the purpose of determining the owner of the suitcase did not violate the Fourth Amendment even in the absence of a warrant authorizing the search or sei-

zure. *United States v. Place,* 462 U.S. 696, 703, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983) ("When the nature and extent of the detention are minimally intrusive of the individual's Fourth Amendment interests, the opposing law enforcement interests can support a seizure based on less than probable cause."). It has long been recognized that the public has a substantial interest in detecting those who would traffic illegal narcotics. *Place,* 462 U.S. 696, 703, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983) (*quoting United States v. Mendenhall,* 446 U.S. 544, 561, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980)). Specifically, the Supreme Court has recognized that:

> where the authorities possess specific and articulable facts warranting a reasonable belief that a traveler's luggage contains narcotics, the government interest in seizing the luggage briefly to pursue further investigation is substantial.

*Place,* 462 U.S. at 703, 103 S.Ct. 2637. This statement is not in conflict with the Supreme Court's most recently ruling in *City of Indianapolis v. Edmond,* 531 U.S. 32, ——, 121 S.Ct. 447, 451, 148 L.Ed.2d 333 (2000), where the Court held unconstitutional fixed checkpoints where the only purpose was drug interdiction as an unreasonable seizure under the Fourth Amendment. Read together, *Place* and *Edmond* inform this Court that though the government cannot not engage in warrantless and suspicionless stops of motorists solely for the purpose of drug interdiction, if an otherwise lawful stop—such as an immigration stop—reveals evidence that gives the officer specific and articulable suspicion that a motorist is engaged in criminal activity, then seizure of that person or property for further investigation is generally not unreasonable.

Therefore, the Court finds that Border Patrol agents had probable cause both to detain the passengers, including the Defendant, and to search the suitcase.

## III. The search of the Defendant's suitcase did not violate the Fourth Amendment independent of whether or not the Defendant gave his valid consent.

In light of the Court's determination that the Border Patrol agents had probable cause to search the Defendant's suitcase, the issue of whether or not the Defendant gave his valid consent is irrelevant for the purpose of determining whether the search of the suitcase violated the Defendant's Fourth Amendment rights. Even if the Court accepts *arguendo* that Agent Navarro did not have probable cause to conduct a search of Defendant's suitcase, the Court finds that the agents had the Defendant's valid consent to conduct the search.

### A. The agents had the Defendant's valid consent to search the bag.

 Law enforcement officers, without warrant or probable cause, may conduct a search if the individual voluntary consents to the search. *United States v. Brown,* 102 F.3d 1390, 1395 (5th Cir.1996). The primary inquiry here is whether the defendant's consent to the search is truly voluntary. *Id.* at 1396. Voluntariness is a question of fact to be determined by the totality of the circumstances. *Id.* Consent may be expressed or implied and knowledge of the right to refuse is not *per se* required for the defendant's consent to be voluntary under the Fourth Amendment. *Id.* When the government relies on the consent of the defendant to justify the lawfulness of a warrantless, suspicionless search, it has the burden of proving that the consent was, in fact, freely and voluntarily given. *Schneckloth v. Bustamonte,* 412 U.S. 218, 221, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).

 The factors considered by the Court in determining voluntariness in-

clude: (1) the individual's knowledge of his constitutional right to refuse consent; (2) the age, intelligence, education, and language ability of the individual; (3) the degree to which the individual exhibits the cooperation with police; (4) the individual's apparent attitude about the likelihood of discovery of contraband items; and (5) the level and degree of coercive police behavior as evidenced by the length of detention and the nature of question. *Id.* at 1396. The Supreme Court recognized that this list of factors is not exhaustive and no single factor is *per se* dispositive. *Id.*

In this case, Agents determined that the suitcase belonged to the Defendant after matching the claim stub to the Defendant's ticket. The Defendant admitted ownership of the suitcase but claimed that it contained only clothing. When asked if they could search the suitcase, the Defendant answered with either "sure" or "I guess so." He informed agents, however, that he did not have the combination to the locked suitcase. Agent Navarro proceeded to open the suitcase with a pocketknife and conducted a search, which revealed illegal narcotics.

**1. A review of the factors and the totality of the circumstances indicate that Defendant voluntarily consented to the search of his suitcase.**

An examination of the above factors indicate that the Defendant gave his valid consent to the search of his bag. The Court notes that the Defendant was not told of his right to refuse consent nor did the Defendant affirmatively invite agents to search his bag. However, these facts are not fatal to a showing of consent and the remaining factors demonstrate that valid consent was given. *United States v. Sutton*, 850 F.2d 1083, 1085 (5th Cir.1988) (holding that the fact that defendant's lack of awareness of his right to refuse consent did not taint voluntariness of consent). There is no proof or allega-

tion that the agents used coercive police procedures either. At no time did the agents brandish any weapons or make any threats to obtain the Defendant's consent. The Defendant's primary basis for arguing that the encounter was coercive is based on his prior experience, including his residence in Los Angeles, his viewing of the Rodney King tape, and his knowledge of the scandals involving the L.A. police. Under the circumstances, the Defendant asserts that he did not feel free to refuse his consent. Though the routine encounter with the Border Patrol agents may have seemed more coercive to the Defendant than to the ordinary person, viewed objectively, the encounter was not attended with the coercive police procedures that would undermine the finding of voluntariness. In addition, the testimony shows that the Defendant's actions in giving his consent did not manifest any apprehension that would convey to the agents the Defendant's unwillingness to cooperate. Finally, the Defendant's level of education and intelligence indicate that he was able to give his consent.

Therefore, the Court finds that the agents had obtained the Defendant's valid consent to search the suitcase.

Because the Court finds that the Border Patrol agent's actions conformed to the requirements of the Fourth Amendment, the Defendant's reliance on the "fruit of the poisonous tree" doctrine is misplaced.

## CONCLUSION

It is therefore ORDERED that the Defendant's Motion for *Daubert* Hearing and Motion to Suppress Evidence are DENIED and that the Findings of Fact and Recommendation by the Magistrate Judge are ADOPTED.