UNITED STATES of America

v.

Howard James WALDRON

No. P–01–CR–245.

United States District Court,
W.D. Texas,
Pecos Division.

Jan. 4, 2002.

2000).

R. Dwight Goains, Assistant U.S. Attorney, Alpine, TX, for the Government.

Elizabeth Rogers, Alpine, TX, for Defendant.

## ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS

FURGESON, District Judge.

After stopping at the Sierra Blanca checkpoint, Defendant Howard James Waldron was arrested and charged with possession with the intent to distribute marijuana, in violation of 21 U.S.C. § 841(a)(1). While being questioned about his residency status, a canine alerted to the rear of his truck. Defendant was then referred to the secondary inspection area and his vehicle searched, even though he was not suspected of an immigration violation.

Before the Court is Defendant's Motion to Suppress Evidence, filed July 19, 2001, in the above-styled matter. After careful consideration, it is the opinion of the Court that Defendant's Motion should be DENIED.

## FACTUAL AND PROCEDURAL BACKGROUND

On June 11, 2001, Defendant entered the United States Border Patrol Sierra Blanca checkpoint. The permanent checkpoint, which had not yet been moved, was located at mile marker 102½, approximately four miles west of Sierra Blanca. Border Patrol Agent Angel Gomez was operating the primary lane on the day in question with his canine partner, Lyka, who is certified annually to detect odors of both humans and narcotics.

Defendant was driving a 1998 Dodge pickup truck with a camper shell and Arizona license plates. At the primary inspection area, Agent Gomez posed three questions to Defendant about: (1) his citizenship, (2) from where he was traveling, and (3) his occupation. While Agent Gomez was questioning Defendant, Lyka ventured to the rear of the vehicle and indicated positive to the tailgate. Agent Gomez had no suspicion that Defendant was an alien smuggler or an illegal alien, yet he referred Defendant to the secondary inspection area.

In the secondary inspection area, Agent Gomez and Lyka conducted a more thorough search of the truck's exterior. Lyka indicated positive to the tailgate a second time. When Agent Gomez opened the camper's back door, Lyka immediately jumped into the bed of the truck and alerted between two boards in the bed area. Agent Gomez then removed a board and found a large bundle containing a green leafy substance that smelled like marijuana. The Agent later found five additional bundles under the other boards. The six bundles held approximately one hundred pounds of marijuana. Defendant was subsequently arrested.

Drug Enforcement Administration Agents Sanchez and Gallardo, both stationed in El Paso and assigned to border cases, were informed of Defendant's arrest. Upon arriving at the Sierra Blanca checkpoint, the Agents advised Defendant of his constitutional rights, including his right to remain silent, yet Defendant made a few spontaneous statements. Among other things, Defendant declared that he could not believe that this was happening to him, this was the first time he did something like this, and he needed the money. The Agents interrupted Defendant to ask if he understood his constitutional rights, and after Defendant invoked his right to an attorney, they only asked him routine booking questions.

On July 19, 2001, Defendant filed his Motion to Suppress Evidence and Brief in Support, arguing that his Fourth Amendment rights were violated and therefore the six bundles containing the marijuana, the $1,529.00 in cash found in the truck and on his person, and his post-arrest statements should be suppressed.

The same day, the Government filed a Response to Defendant's Motion to Suppress. The Government retorts that no constitutional violation occurred because the stop could be made without reasonable suspicion, Defendant's detention did not extend beyond the scope of the stop, and the canine alert justified the search and seizure of the above-listed items.

A hearing on Defendant's Motion to Suppress Evidence was held on December 17, 2001. After considering the thoughtful arguments made by defense counsel, the Court concludes that Defendant's stop was a standard constitutional immigration checkpoint stop under Fifth Circuit and Supreme Court precedent.

## DISCUSSION

■ Here, the Court must determine whether the recovery of the narcotics failed to comply with the Fourth Amendment; that is, whether the search and seizure invaded Defendant's reasonable expectation of privacy. If the Court determines that the stop violated Defendant's constitutional rights, then all evidence seized and incriminating admissions made must be suppressed as fruit of the poisonous tree.[1]

### I. The Sierra Blanca Checkpoint.

Checkpoint stops are seizures within the meaning of the Fourth Amendment,[2] but are constitutionally infirm only if unrea-

sonable. In determining what is reasonable in a particular situation, a court is to weigh the public interest against the individual's privacy interest.[3] The United States Supreme Court has balanced these interests with respect to both immigration and drug checkpoints, upholding the former as constitutional and striking down the latter.

In *United States v. Martinez–Fuerte,* the Supreme Court upheld the making of warrantless, suspicionless stops at immigration checkpoints. The Court found a substantial public interest in maintaining interior immigration checkpoints on specific highways because they are effective in controlling the flow of illegal aliens into the country.[4] In addition, requiring reasonable suspicion would undermine this interest by fostering well-disguised smuggling operations and would be impractical because of the difficulty in observing factors particular to alien trafficking.[5]

On the other hand, the Court determined that the intrusion on motorists' privacy interests caused by suspicionless immigration checks is limited and outweighed by the public interest. The potential interference with legitimate traffic is minimal because the detention is brief, no search is performed, and motorists may easily find out the location of the checkpoints.[6] Further, checkpoint agents have little opportunity stop particular vehicles at their pleasure.[7] For the same reasons, the Court held that referrals to secondary for the

1. *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

2. *United States v. Martinez–Fuerte,* 428 U.S. 543, 556, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976).

3. *Id.* at 555, 96 S.Ct. 3074.

4. *Id.* at 556–57, 96 S.Ct. 3074.

5. *Id.* at 557, 96 S.Ct. 3074.

6. *Id.* at 558–59, 96 S.Ct. 3074 (distinguishing permanent checkpoints from roving patrols in which reasonable suspicion is required to stop a vehicle and determining that "the subjective intrusion-the generating of concern or even fright on the part of lawful travelers-is appreciably less in the case of a checkpoint stop").

7. *Id.* at 559–60, 96 S.Ct. 3074 (discussing the limited discretion of officers at checkpoints).

sole purpose of conducting a "routine and limited inquiry" into immigration status need not be based on reasonable suspicion.[8]

Twenty-four years after *Martinez–Fuerte*, the Supreme Court re-examined the checkpoint issue and held that suspicionless stops at drug interdiction checkpoints violate the Fourth Amendment.[9] The key distinction between immigration and narcotics checkpoints is their primary purpose, which in the latter case is indiscernible from the state's general interest in crime control as distinguished from the unparalleled problems of policing the border for illegal aliens.[10] In sum, checkpoints designed to detect illegal aliens are constitutional while drug checkpoints are not.

 Defendant today invites the Court to declare Sierra Blanca a drug checkpoint, thereby invalidating his stop from the start, and to overturn *Martinez–Fuerte*.[11] The Court, though, declines Defendant's invitation.

Defendant recites the following facts as supporting his argument that, despite its established recognition as an immigration checkpoint,[12] the Sierra Blanca checkpoint's primary purpose is drug interdiction: canines are used at primary to detect drugs, not illegal aliens, and more drug arrests are made there than immigration ones.

With respect to the first matter, Defendant mischaracterizes the purpose of the canine sniff; the dogs are trained and certified to detect the odors of both narcotics and humans.[13] Because the use of canines at the primary lane serves the valid immigration purpose of detecting hidden aliens, it does not definitively affirm Defendant's assertion.

With respect to the second matter, Defendant does not cite any official statistics verifying that more arrests are made at the checkpoint for drug-related offenses than immigration-related ones. Although Agent Gomez speculated that of all the cases made at the Sierra Blanca checkpoint, drug cases comprise the largest percentage with immigration cases a very close second, which concerns the Court, there is no conclusive confirmation of Defendant's contention.

Drug trafficking often comes hand-in-hand with alien trafficking, and drugs

---

**8.** *Id.* at 560, 563–64, 96 S.Ct. 3074 ("The objective intrusion of the stop and inquiry thus remains minimal. Selective referral may involve some annoyance, but it remains true that the stops should not be frightening or offensive because of the their public and relatively routine nature.").

**9.** *City of Indianapolis v. Edmond*, 531 U.S. 32, 121 S.Ct. 447, 148 L.Ed.2d 333 (2000).

**10.** *Id.* at 40–42, 46, 121 S.Ct. 447.

**11.** Defendant appears to have at least one supporter on the high court. *See id.* at 56, 121 S.Ct. 447 (Thomas, J., dissenting) ("I am not convinced that *Sitz* and *Martinez–Fuerte* were correctly decided. Indeed, I rather doubt that the Framers of the Fourth Amendment would have considered 'reasonable' a program of indiscriminate stops of individuals not suspected of wrongdoing.").

**12.** *United States v. Jackson*, 825 F.2d 853 (5th Cir.1987) (holding that the Sierra Blanca checkpoint is not the functional equivalent of the border, but that it is a constitutional, permanent immigration checkpoint); *see also, e.g., United States v. Gonzalez–Basulto*, 898 F.2d 1011, 1012 (5th Cir.1990); *United States v. Dovali–Avila*, 895 F.2d 206, 206 (5th Cir. 1990) (both referring to Sierra Blanca as a permanent immigration checkpoint).

**13.** *Cf., e.g., United States v. Outlaw*, 134 F.Supp.2d 807, 811 (W.D.Tex.2001); *United States v. de La Rosa–Valenzuela*, 993 F.Supp. 466, 467 (W.D.Tex.1997) (both acknowledging that dogs are trained to detect concealed humans).

cross the border from Mexico into the United States almost as frequently, or maybe even more so, than illegal aliens. These facts explain the large percentage of drug-related arrests. Moreover, Sierra Blanca remains an ideal place for an immigration checkpoint due to its proximity to the border.[14] As the Fifth Circuit once expressed:

> Along much of the Mexican–United States border runs the Rio Grande River, which, in spite of a name indicating contrary magnificence, can be driven across, waded across, and easily [swam] across at all times, and much of the time can be walked across without wetting a foot. With so much access to a highway parallel to the border by aliens who could easily have walked across the border, we think the Fourth Amendment rule of reason would permit a search for those aliens of vehicles that may have taken them aboard after their arrival by other means within our boundaries.... [T]he impracticality of guarding every part where human crossing could be made should be so apparent as to make inexorably reasonable some method of curtailing illegal entry such as established at the Sierra Blanca checkpoint.[15]

The Court believes that easy access and the impracticality of patrol still plague the area today and justify the continued operation of Sierra Blanca as an immigration checkpoint.

Narcotics smuggling is one of the Border Patrol's concerns, but its primary purpose relates to immigration. The Sierra Blanca checkpoint is a constitutional immigration checkpoint under *Martinez–Fuerte*, and consequently, Defendant's suspicionless stop was valid. To redesignate Sierra Blanca as a drug interdiction checkpoint, Defendant will have to appeal to a higher court.

## II. The Primary Inspection Area.

The liberal nature of immigration checkpoint stops can be contrasted with the stricter restrictions on their scope.[16] Because *Martinez–Fuerte's* holding was limited to brief stops at permanent immigration checkpoints and referrals to secondary for the purpose of investigating residency status,[17] the Supreme Court did not address the questioning of individuals about or the referring of vehicles to secondary for non-immigration-related purposes. However, in *United States v. Machuca–Barrera*,[18] the Fifth Circuit did.

The general rule is that a detention must last no longer than is necessary to effectuate the purpose of the stop.[19] The permissible duration of the stop depends on its scope, which in turn is "limited to investigation of matters justifying the stop."[20] An officer may ask questions outside the immigration-related scope of

**14.** *Jackson,* 825 F.2d at 855 n. 1 ("The Sierra Blanca checkpoint itself is situated 20 land miles and 14 air miles from the United States–Mexico border."); *id.* at 864 ("The geography surrounding Sierra Blanca ... strongly supports the propriety of the selected location.").

**15.** *Id.* at 855–56 (quoting *United States v. Hart,* 506 F.2d 887, 897 (5th Cir.1975)).

**16.** *See United States v. Martinez–Fuerte,* 428 U.S. 543, 556–57, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976) ("The principal protection of Fourth Amendment rights at checkpoints lies in appropriate limitations on the scope of the stop.") (citations omitted).

**17.** *Id.* at 567, 96 S.Ct. 3074.

**18.** 261 F.3d 425 (5th Cir.2001).

**19.** *Florida v. Royer,* 460 U.S. 491, 500, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983).

**20.** *Machuca–Barrera,* 261 F.3d at 432.

the stop, so long as such questions do not extend the duration of the stop.[21]

Beyond the clear statement that immigration stops must be brief, *Machuca–Barrera* does not delineate a specific time limit for such stops; nor does the case stand for the proposition that the stops must occur as fast as humanly possible. Agent Gomez's three questions "took no more than a couple of minutes; [this] is within the permissible duration of an immigration checkpoint stop." [22] Although Agent Gomez asked a question about Defendant's occupation, which may seem unrelated to his residency status, the Court will not second-guess the Agent's judgment in asking it.[23]

Likewise, because the canine-sniff occurred during Agent Gomez's questioning of Defendant, it did not extend the permissible length of the immigration stop.[24] In addition, the use of the canine did not violate Defendant's constitutional rights because dog sniffs are not searches within the meaning of the Fourth Amendment and do not require reasonable suspicion.[25]

### III. The Secondary Inspection Area.

Defendant further contends that his Fourth Amendment rights were violated by the referral to secondary and the search of his vehicle. The validity of these actions depends on their purpose. Referrals to secondary may be made without individualized suspicion if made for routine and limited immigration-related purposes.[26] Checkpoint searches and extended detentions of motorists for such purposes must be justified by consent or probable cause.[27] In contrast, referrals to secondary unrelated to immigration and investigations of non-immigration matters extending the permissible duration of the immigration stop may be made if and only if the initial, lawful stop creates reasonable suspicion of the non-immigration offense.[28] Thus, if Agent Gomez had reasonable suspicion of a narcotics violation, he was justified in detaining Defendant and searching him for this non-immigration purpose.

Lyka's alert to Defendant's tailgate provided Agent Gomez with sufficient reason to refer Defendant to secondary and to search Defendant's vehicle.[29] Therefore, the stop, the detention, and the search were constitutional.

### CONCLUSION

Because the Sierra Blanca checkpoint is an immigration checkpoint and reasonable suspicion of a drug offense was established during the brief questioning of Defendant at the primary lane, the stop and search of

**21.** *Id.* ("It is the length of the detention, not the questions asked, that make a specific stop unreasonable ....").

**22.** *Id.* at 435.

**23.** *Id.* at 433–34 (emphasizing that agents must be given leeway to formulate questions and that such questions will not be scrutinized by courts as long as they generally relate to determining immigration status).

**24.** *Id.* at 432 n. 21 (noting that "border patrol agents may only conduct a drug-dog sniff if it does not lengthen the stop or if they obtain consent").

**25.** *United States v. Hernandez*, 976 F.2d 929, 930 (5th Cir.1992).

**26.** *See supra* note 8 and accompanying text.

**27.** *United States v. Martinez–Fuerte*, 428 U.S. 543, 567, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976) (citations omitted).

**28.** *Machuca–Barrera*, 261 F.3d at 434 (footnote omitted).

**29.** *United States v. Zucco*, 71 F.3d 188, 191–92 (5th Cir.1995).

Defendant's vehicle did not contravene the Fourth Amendment.

It is therefore ORDERED that Defendant's Motion to Suppress Evidence be DENIED.